So Acheron Portfolio Trust v. Mukamal Okay, Ms. Rodriguez Thank you. Good morning. May it please the court, Julie Rodriguez on behalf of the appellants. We have raised three issues on appeal. The first one is arbitrability. The second one is whether the Acheron Trust can enforce, have standing to enforce the 2015 agreement. It seems like the standing issue is a sideshow because Acheron Capital has standing anyway. Am I missing something? Here's the problem that we have. One of the concerns in bringing this issue and pursuing it is they raised it, right? I mean, if Acheron Capital has standing anyway, we're going to have to decide this issue, right? I want to take that position. What I put in the initial brief because I wanted to see their reaction is the concern is that they will ultimately take the position that Acheron Capital, although it is the signatory to the 2015 agreement because it does not own any fractional interest, any policy interest, cannot actually enforce those provisions. And that may sound a little outlandish right now, but I got to tell you that we've been fighting about every single thing in this case. So that's an entirely possible thing that could happen. Yeah, you're right about fighting about every little thing. Yes, and my point to you is simply this, is that we said that in the initial brief to see what the reaction was. And what I didn't see in the answer brief was a statement that, yes, Acheron Capital, even though it does not own any fractional interest, could still enforce the 2015 agreement. Well, it seems to me pretty clear that Acheron Capital has standing, so it seems like the standing issue is moot. Judge, I don't even want to push that issue if you see it that way. But I think it would lend a lot of clarity if the trustee were to clarify that. The problem for me is that the issue of arbitrability appears to me not to have been clearly and unmistakably delegated to the arbitrator. I understand. Let me go through that because I think ultimately what I want to make sure is that I address the last point. Because even if you disagree with me on the first two, we still have to address the servicing nature of the PROTIC agreement and whether it's subject to arbitration. But on whether who decides arbitrability, we look at the JAMS rules as once we invoke that in the contract, and there's no dispute that we did, right, we look to rule 1A and 1B. And what those rules tell us is that, and I'm quoting here. Give me a second. We have these cases where we say that the parties contemplate or expressly say, look, the rules will govern, right? This case looks different in that the agreement makes some reference to a specific rule without saying that all the rules will govern. And that looks like a pretty critical difference here. And I understand the concern. And what I know you're referring to is, so we have the main section, 3C, that leads into you're going to, if you're going to arbitrate, it shall be pursuant to JAMS. And then, and it will be pursuant to these additional provisions, right? And so you have subsections 1, 2, and 3. When you get to subsection 3, it tells us that, you know, you have to go through mediation and no earlier than that, except that you can seek provisional remedies under JAMS rules, right? Yeah, it may be that they contemplated a specific JAMS rule would apply. And that the arbitrator, that the arbitration would be by JAMS. But only if the parties didn't agree on a mediator, right? Right. Yes, right. One thing that caught my eye when we were looking at that provisional remedy, like to invoke where the JAMS rules are specifically invoked, is that this is very much a preliminary issue and provisional remedy in terms of coming into court and saying at least have us, have the arbitrator, which we know under Rule 11B of the JAMS rules, has the authority to decide arbitrability. But look, ultimately what really caught our eye is that under section, not section, JAMS Rule 1A and B, it does say that, and I'm quoting, the party shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by JAMS without specifying any particular JAMS rules and the disputes or claims meet the criteria of the first paragraph of this rule. What they're referring to is the monetary threshold, which we meet, and they don't dispute. So that's under, I read off of 1B, and then that kicks you over to 1A to show the monetary threshold. That's really what we were struggling with in terms of we felt that was the clear and unmistakable intent of the parties so that when they said we are going to be arbitrating under JAMS, this provision tells us that when you do that, even when you don't specify the rules, you are to be deemed to be subject to the JAMS rules. And when you do that, then of course we flip over to Rule 11B, which tells us that jurisdictional and arbitrability issues are for the arbitrator to decide. So what if the parties had both agreed on a mediator, and that mediator was not with JAMS? Then at that point, the JAMS rules don't apply, right? Right. Let me make sure I understand. If the parties had not chosen a JAMS mediator? Right, because in Section C, it says if trustee and Atteron are unable to agree with respect to the terms of the new service agreement or further extension of the existing service agreement, then the parties shall submit their dispute to mediation by a mediator who is mutually acceptable to both parties. Full stop. And then if the parties are unable to agree on a mediator, the dispute shall be submitted to JAMS. So if the parties had agreed on a non-JAMS mediator, then would the JAMS rules have applied? I believe so. But let me point something out factually here. So the way this played out is that they just didn't agree to mediation or arbitration, right? When we demanded to fold our arbitration into the existing, there was another arbitration proceeding happening at the time, and we said either fold us in or give us dates for mediation, they just said flat out no. And so when you go to subsection 3C sub 3, one of the things that it tells us is that the requirements of, you know, what to certain things that you're bound by are not applicable if the parties are not complying with the mediation requirements. So section 3 is structured so that you meet 1, 2, and 3 prongs. If I'm hearing you correctly, listen, I do understand the concern. We see this just in light of 1A and 1B as something that the parties, because this was in effect at the time, this rule, that they, when they said we are going to arbitrate pursuant to JAMS, that these rules were going to bind us, period. And so we were taken a little aback that it wasn't, but I do understand the concern. Unless you have other questions, I would like to move on to the third point, which is the nature of the PROTIC agreement and whether it's subject to arbitration. So the way we look at the PROTIC agreement is very much like the backup servicer agreement that this court addressed in the earlier appeal back in 2020. Back then, the court addressed Q Capital, which is also involved in this case tangentially. And what they wanted to come in and do was assist with servicing, right? And specifically, and I'm quoting from the decision of this court back in 2020, they would be coming in to upload the trust data on a periodic basis into a case management system, providing reporting to the trust and reviewing and testing the data to ensure it has been transmitted and backed up appropriately. That's it, right? So that is a component as best, if you were to compare that to what Latai does on a day-to-day basis, which the court actually summarized in the opinion, and it's a far more comprehensive task. I'm quoting from the opinion again. On a day-to-day basis, Latai is responsible for many services, including fund management, policy premium payment services, accounting and reporting services, insure tracking services, death claim management, customer service, policy change functions, maintenance and updating, financial reporting, access to records and disposition services. I read this to you to make the final point, is that much like the backup servicer agreement in that case that you found was subject to Section 3, right, that Ashwin has a right to invoke, so is the pro-tick agreement. But I would submit to you that it's even more crucial because the Q capital service agreement was almost like a belt and suspenders type of agreement, right, providing servicing in its colloquial sense. But pro-tick is coming in to actually facilitate the actual servicing because without it, we know that Q capital can't service fractional interest. They're facilitating another entity that will actually provide the servicing. Isn't that right, or am I misunderstanding? Right, pro-tick comes in to help Q capital service the fractional interest because without it, it can't do it. It's very much like Judge Pryor, Latai needed its, and I'm forgetting the acronym at this moment, PTBS, I believe it is, needed that software to actually function as a primary servicer. How far does that go, right? If, you know, if there's a wireless provider, obviously the entity couldn't provide service without wireless. Would that qualify also as a service agreement under your definition? I hesitate to go into hypotheticals because I feel like I'm going to go down a rabbit hole that we can't come back out of, but let me answer it this way. That's why we ask them. But let me answer it, and I hope I can answer it this way for you. When they gave certain analogies, right, to services, I think you're going like an attorney subscribing to Westlaw, right? We see it more in terms of, you know, a doctor getting the education needed to actually perform, you know, a surgery or whatever it is that he or she practices. What I ultimately come back to is that to us it was very telling because, and this goes back to the plain language of the 2015 agreement, that in the Protech 2020 case, you looked at an agreement very much like Protech that didn't just cover the wide span of what Latai does, but you looked at it as a servicing agreement. And you should look at Protech the same way because both are assisting, and Protech is by far giving far more to Q Capital in this instance and to the trust, right? So that's where we stand with that. Before you sit down, you'll be on my time for this one. But in response to some, so Judge Grant asked you about something that I'm not sure we totally fleshed out. But the agreement says if the parties are unable to agree on a mediator, the dispute shall be submitted to JAMS or its successor for mediation. And if the matter is not resolved through mediation, then it shall be submitted to JAMS for final and binding arbitration, right? So the only arbitrator contemplated by the agreement insofar as arbitration is concerned, not mediation, is JAMS. Is that right? Yes, that's my understanding. But it does not make, it does not say that when it's submitted to JAMS that all the JAMS rules will apply. It's just silent about all the JAMS rules, right? That is correct. The only instance where JAMS rules comes up is in subsection 3C3. Yeah, with respect to specific rule that doesn't have anything to do with who decides arbitrability. I would agree with you, Judge. The only thing that gives me pause there is the reference to provisional remedy. I don't know exactly what they mean. Typically things like attachment come to mind, right? Something provisional. But I refer you back to Jam Rule 1A and 1B as the point that really concerns us in terms of the clear and unmistakable intent of the parties. Okay. Thank you. Thank you. Mr. Arastia.  Morning. May it please the court. I'm here with my colleague, Angelo Castaldi, on behalf of the appellee, Barry Muckelmall, the trustee of the Mutual Benefits Keep Policy. Let me answer some of your questions right out front. Judge Grant, you talked about mediation and what if the mediator is not a mediator from JAMS. And that was actually addressed because while there was no complaint that was filed, while there wasn't an arbitration that was filed directly by the appellants, they did tell Magistrate Judge Strauss, we're going to bring this issue before a pending arbitration. And that arbitration is cited in their brief, Trustee's Motion to Confirm Interim Arbitration Award. That's docket entry 2694. If I look at the agreement, the only arbitrator that's referred to where it contemplates arbitrator is JAMS. Isn't that right? No. Where does the agreement refer to arbitration being provided by someone else? It only refers to arbitration in 3C. 3C is the section that discusses arbitration. Okay, and I just read it a moment ago when your adversary was at the lectern. And it says, if the parties are unable to agree on a mediator, the dispute shall be submitted to JAMS or its successor for mediation. And if the matter is not resolved through mediation, then subject to the limitations set forth in Section 7 below, it shall be submitted to JAMS or its successor for final and binding arbitration. That's the only arbitrator I see referred to. Am I wrong? It's the only administrative body, and it's reasonable to infer that that body will have a JAMS arbitrator. I know, but it doesn't say that the parties could agree on a mediator, on an arbitrator. It says they could agree on a mediator. That is correct. But not an arbitrator. Arbitration will be provided by JAMS. Correct. And the only reference to the rule is when it describes the provisional remedy in 3 Romanet 3. It says, at no time prior to the mediation impasse, shall, quote, either party initiate an arbitration or litigation related to the agreement, except to pursue provisional remedy that's authorized by law or JAMS rule or agreement. That's in the disjunctive. So the only reference. So except for that disjunctive description of the provisional remedy, the JAMS rules are not incorporated. And as chief judges, you stated earlier, that's not clear and unmistakable or evidence of clear and unmistakable intent. And that is the first options case by the Supreme Court. It's been re articulated by JPEG, by this court and by DDK, by every circuit. That is the standard. It is an undisputed standard that the default is the questions of arbitrability are reserved for the court, unless the parties, as with any other contract, have expressly indicated through clear and unmistakable intent that they will have the arbitrator decide this. Tell me this before I forget it. Am I right about the standing issue being a sideshow because Adrian Capital has standing in any event? Yes. But let me explain. I can explain to you. I love yes. Yes. That's a great answer. And the reason is very simple. Okay. Because they conceded in their brief. They admit that the same issues are, I know it's hard to believe, in yet another appeal from this case. But they admit that in the 2018 case, which is pending before this court. Three, you, me, Brett. I've been lucky so far. Until now. I would agree. I would also concede that the parties fight about everything. But in Appeal 22-10748, with respect to the agency and third-party beneficiary issue, they say in their brief, which the district court decided did not have to be decided in this case, is being litigated in a related action pending between these issues. And they go on to say, and I'm quoting, in pursuing this issue, part of what plaintiffs want to avoid is any future argument that Asheron Capital, the signatory does not own any policy interest, is effectively barred from enforcing the 2015 agreement to protect the interest of the actual owners, the Asheron Trust. So what they're doing, and it's very clear, what they're pursuing, the reason they're pursuing this non-issue, the definition of an immaterial issue, because as Judge Strauss said, it doesn't matter. They're trying to pre-decide in this case what will happen in another appeal that is pending before this court. I really just want to decide this case, but go ahead. Do you have any objection to our vacating that part of the district court's order if it doesn't matter and it might impact future cases adversely to one of the parties? I do not have an objection to that. And I would say that having been with this particular magistrate on several issues in this case, he does oftentimes analyze things in the alternative for the benefit of the district court, because if the district court does not apply everything, he's already done the work up front. And I feel fairly comfortable that that's what the magistrate judge did in this case. But there is no objection, Judge Pryor. One of the things that's interesting is they talk about how they wanted to go to arbitration. But again, they told the magistrate judge that they were going to proceed with these claims in arbitration. They referenced it in their brief. What they don't tell you is that the arbitrator made findings of fact and conclusions of law, and he determined the question of arbitrability concerning Asheron Capital's challenge claims and defenses do not belong to the tribunal. He found, as the arbitrator, this is a narrow carve-out. This is a limited arbitrable issue and agreed the jurisdiction in Section 23 is a broad, a very broad grant of jurisdiction to the court with a very narrow, limited carve-out for mediation and arbitration. Judge Grant, am I mistaken? I think you might have a question. Tell me in what context that was stated. I don't remember that in the record, what you just told us. About the arbitration? They referred to it at footnote 7 in their brief. They reiterated it in their reply, and they referred to the trustee's motion to confirm interim arbitration award, and that motion has the arbitrator's interim award attached, and that's docket entry 2967. The magistrate judge, without objection, adopted the main case, the 2004 enforcement case. He adopted the documents in that record because they were related. What about the agreement? What about the agreement? The nature of the agreement. Why I think our precedent in SEC versus Mutual Benefits Corp. decided that even lesser agreements might qualify. The way that I understood that opinion was the court said that a backup servicing agreement is still a servicing agreement, whether it's primary or backup, and there is no dispute that this was a motion to approve a backup servicer. The trustee made that motion. The idea was to have a backup servicer. That was later withdrawn. There's no indication in the record of anything further moving with this. This, however, is just a motion. This had to do with the pro-tech servicing agreement. The court, the magistrate judge, carefully contrasted and compared them. He highlighted all the differences between the two. A servicing agreement is not a defined term. The only thing we had to go by was the existing servicing agreement. And what was very insightful was, as the district court found, the obligation is on providing servicing. If you don't have a tool, if you don't have a piece of software, if you don't have any tool, the obligation still exists. It's the obligation of the servicer to still perform the duties. That is the fundamental difference. But just looking at the comparison and the contrast, that there is many things that a piece of software can't do in providing the servicing. And that's all identified very carefully by the magistrate judge, who appeared to take great pains in ensuring that this analysis was fully set forth. Now, I can talk about the standard of arbitrability, but it seems to me that the court's well-versed in its own jurisprudence as well as the Supreme Court and the need for unmistakable and clear intent that the parties want the arbitrator to decide an issue. And further, that just referring to an arbitration administrator, without incorporating the rules, is insufficient to rise to that level. Further, the Second Circuit and DDK Hotels said, wait, it doesn't matter. In the case, just as we have here, of a very narrow, constrained arbitration clause, even if, not saying it's the case here, but even if you incorporate the rules, that's not enough to give you the level of clear and unmistakable intent. And why is that? Because it's ambiguous. When you have a narrow clause... I don't think that's consistent with our precedents. I mean, look, I think our precedents say that if you incorporate the AAA rules, for example, and they provide that the arbitrator decides arbitrability, then there is clear and unmistakable delegation. So, I think that's what our precedents say, but you don't have to go that far, do you? No, we don't, but I... Because we don't have that. But I would say that is a... Terminix and Green Tree are broad arbitration clauses, and the Second Circuit examined a narrow clause where you have a broad... I have memory of Judge Choflat writing opinions for our court that where you incorporate all the rules and that's what the rules provide, that satisfies our precedents, I think. I would just say the DDK focused on the narrowness of the clause, and I will leave it at that because we don't need to get there because there is no reference to the rules. So, looking at... There's no incorporation of the rules as a whole. Correct. Right? That is absolutely correct. Or the specific rule that provides that the arbitrator decides arbitrability. That is absolutely correct. Okay. With that, thank you. Ms. Rodriguez. Save five minutes. Let me start with a standing issue because I would very much like to take Judge Pryor up and the rest of the panel if you're so inclined to strike, vacate that portion of the district court's order. Clearly, both Judge Magistrate Strauss and Judge Gales... My problem is if we vacate it, it seems like we're deciding it. It seems to me it doesn't matter because we're going to have to decide the appeal anyway with respect to Asheron Capital. Let me put it this way. Even today, I have not heard them say that Asheron Capital can enforce the 2015 agreement even though it does not own... I heard him say that. If you did and I missed it, I apologize. What I did hear was no objection to vacating that portion because it doesn't do anything for us. I will tell you why it matters to us and I'll leave it at this. It matters to us for the reasons I've explained because we are bound by that ruling, which we firmly believe is erroneous. If it's not necessary though to the final resolution by us because Asheron Capital has standing anyway, I'm not sure that you're bound by it. If the opinion can make that clear, it would go a long way because honestly, we will be fighting about that the next round. There's no question y'all will fight about everything. Judge, I wish it were differently. Are you saying there's a law of the case issue? That's what I'm afraid of. That's what I'm very concerned with. As you know or may know, we have other appeals pending here, one of which is expedited on the sale of the policies and the 2015 agreement is at the center of that dispute. Things like this will matter. Moving on to the PROTIC agreement, let me go back to the contract because this is what caught this court's attention when it was deciding the 2020 appeal. Part of what the contract provides is that the Asheron agreement grants Asheron, quote, the right to participate actively in any negotiations that involve the servicing of any policies in which Asheron has an interest. And then, of course, we can also refuse to any new servicing agreements because we have to be part of those negotiations to begin with. But that language that involves servicing, we don't not only not have the term servicing agreement defined in the contract, but it's also unfair, right, to equate it with the Latai servicing agreement. You'll see it capitalized for Latai as a defined term. And then when it speaks to our rights, Asheron's rights under Section 3, it's a small case. And again, when this court addressed this language in the 2020 appeal, I think logically it looked at it as this is a servicing issue. PROTIC is the same. And again, not to go down this road again extensively, but it's because we know how important PROTIC is to the process because we now know that by the trustee's own admission, that is an overlay that is needed for Q Capital to actually service the fractional interest. So no PROTIC. What about the fact that the agreement refers to servicing as performed by Latai or any replacement servicer? Doesn't that suggest that a servicing agreement would need to be in the nature of the agreement with Latai? I mean, certainly in the nature of, because that's our standard bearer, right? The provider for servicing these policies is the beginning. So sure, we look to that. But when you look at Section 3 as a whole, though, it doesn't limit us to that. Because again, it would have been easy enough, right, to say any new servicing agreement that really has to encapsulate everything that the capitalized servicing agreement with Latai is doing. We know that ultimately any servicer has to do it. What we're looking at here is, what is our right relative to this Section 3? And again, I keep going back to the 2020 decision because there we talked about a portion, a subset of servicing. It was a backup servicer, right, providing limited data, backup analysis. PROTIC is coming in very much like that, but at the outset of the process. And for those reasons, I did want to touch upon one last thing just for clarification on the arbitration portion. My colleague was referring to an interim award that the arbitrator and the other arbitration had made. We did drop that footnote. It was since then, which is extra record material, that the arbitrator entered some orders. They clarified basically and said, look, I'm following basically the report that Judge Strauss entered on arbitrability and we're waiting to see what this court ultimately does. I can tell you just so the court knows that there was effective, I believe it was March 28th of 2022, an amended interim order entered by the arbitrator indefinitely staying the arbitration. The long and short of it was the mediation preconditions had not been met. And so he said, look, either tell me that you don't want to proceed with it, trustee, or we'll leave it open. That was the backlog. Thank you very much for your time. I appreciate it. Thank you. Move to our last case.